Filed 11/21/25  P. v. Nave CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C101819 |
| Plaintiff and Respondent, | (Super. Ct. No. 62185001) |
| v. | |
| RICHARD DAMIEN NAVE, | |
| Defendant and Appellant. | |

The trial court denied defendant Richard Damien Nave's petition for mental health diversion.  The court found him eligible but not suitable, reasoning he posed an unreasonable risk of danger to public safety if treated in the community.  Defendant then pled no contest to assault with a deadly weapon, admitted three prior strike allegations, and was sentenced to 25 years to life in prison.  On appeal, he contends the trial court abused its discretion in denying his diversion petition.  We disagree and affirm.  Undesignated statutory references are to the Penal Code.

**BACKGROUND**

On April 17, 2022, Placer County Sheriff's Deputy Anthony Santiago responded to an assault of a Starbucks employee.  The victim told Santiago that shortly after she had

arrived for work at 4:15 a.m., a transient-looking man she did not recognize approached her and told her he also worked there. The victim told the man to wait outside, but he followed her inside. Once inside, the man put his right arm around the victim's throat. He was holding a "box-cutter-type" knife. The victim pushed the man away and sustained a cut on her finger. The man ran from the Starbucks. The incident was captured by a surveillance camera inside the Starbucks.

A short time later, defendant was taken into custody about a mile and one-half from the Starbucks. During his arrest, defendant was seen throwing a box cutter into nearby bushes.

Another responding officer testified that he went to a convenience store across the street from the Starbucks to search for the suspect. The store clerk told him the suspect had come into the store earlier that morning asking for methamphetamine and said he "wanted to kill people," which frightened her.

Defendant was charged with assault with a deadly weapon (§ 245, subd. (a)(1)) while released on bail or his own recognizance (§ 12022.1, subd. (b)). The information alleged defendant had three prior strikes based on robbery convictions in 2004, 2009, and 2016 and those convictions also constituted prior serious felonies.

Appointed counsel immediately declared a doubt as to defendant's competency to stand trial. At that point, defendant had two criminal matters pending "in [section] 1368 status." In one of those cases—a felony second degree burglary case—the court had found defendant incompetent in March 2022 and committed him the Department of State Hospitals (DSH), but released him on DSH diversion over the prosecutor's objection in April 2022. After being admitted to a crisis residential treatment program on April 13, 2022, under the terms of the DSH diversion plan, defendant left the facility in the middle of the night on April 15. Two days later, on April 17, defendant was arrested for committing the current assault.

The trial court found defendant incompetent to stand trial on the assault and committed him to the DSH. In October 2023, the medical director of Napa State Hospital certified defendant's competence had been restored. Defendant was diagnosed with schizophrenia as well as severe methamphetamine, alcohol, and cannabis use disorders. When first admitted to DSH in December 2022, defendant presented with prominent psychotic and mood symptoms, but by October 2023, the symptoms of mental illness were absent. Defendant was medication compliant. Based on the hospital's competency certification, the court found defendant competent and reinstated the criminal proceedings.

In November 2023, defense counsel requested that defendant be evaluated for mental health diversion. The trial court granted the request and appointed Dr. Michelle Deubert to conduct the evaluation.

Dr. Deubert interviewed defendant in February 2024. She reported that defendant had a history of medication noncompliance, but he was currently prescribed antipsychotic and mood stabilizing medications that had helped stabilize his mental health symptoms. He also had a significant history of alcohol and substance use that "likely complicated his mental health history" with "[no] history of substance abuse treatment."

Dr. Deubert conducted a violence risk assessment. Defendant's risk factors included "symptoms of mental illness, substance use, housing instability, history of violence, and unemployment." His protective factors included "a positive attitude toward intervention, insight in mental illness and need for treatment." Defendant did "not appear to have attitudes that condone offense and/or physical harm," was responding well to treatment, and had demonstrated insight and motivation at the time of the evaluation. But Dr. Deubert did note that his "history of medication noncompliance and use of substances . . . likely . . . increase[d] his [violence] risk." In Dr. Deubert's opinion, defendant did "not appear to be a risk to public safety" at that time.

In April 2024, defense counsel moved for pretrial mental health diversion under section 1001.36, attaching Dr. Deubert's psychological evaluation and the Napa State Hospital's mental competency certification. Counsel asserted defendant was unlikely to commit a super strike if treated in the community because the video surveillance showed his interaction with the much smaller victim was fleeting with no purposeful effort to harm her. Counsel also asserted it was unclear why defendant left his residential treatment program when released on DSH diversion.

The People opposed diversion, arguing defendant had a history of not complying with mental health treatment plans and refusing medication, he had a violent criminal history with three robbery convictions, and he had personally used a weapon during the assault on the victim here that showed a significant risk he would commit a super strike if released. They further argued Dr. Deubert did not adequately consider defendant's pending assault charge in opining on defendant's risk to public safety.

In support, the People attached multiple documents. These included a March 2022 letter from the Placer County Adult System of Care that originally found defendant was not suitable for DSH diversion given his extensive criminal history that dated back to the 1990's and that included convictions for serious and violent felonies, his pending "[burglary] charges, transient lifestyle, and significant substance abuse." The People also attached the following: the court order granting DSH diversion in the burglary case after the Placer County Adult System of Care changed its initial recommendation; defendant's prior DSH diversion treatment plan that required intensive case management services, residential treatment, and monitoring for medication management and substance abuse; and a May 2022 Placer County Adult System of Care letter stating defendant was no longer a candidate for DSH diversion given he committed the assault two days after absconding from the residential treatment facility.

The trial court considered diversion at a hearing in May 2024. Defense counsel asserted defendant was not a danger to the public because he had not seriously injured the

4

assault victim despite having the capability to do so and disagreed that Dr. Deubert failed to adequately account for the current assault charge in her evaluation. Counsel further argued defendant's conduct at the Starbucks was not "purpose driven" or an attempt to rob or kidnap; instead, it was "untethered from any rational purpose." The People again argued defendant posed an unreasonable risk of danger, as he had "re-offended in one of the worst possible ways short of committing a super strike" two days after being released on DSH diversion, and the only reason a lethal injury was not inflicted on the victim was because she fought back when defendant grabbed her around the neck while holding the box cutter knife.

The trial court denied defendant's request for diversion, finding him eligible but not suitable because he posed an unreasonable risk of danger to the public.

Defendant then pled no contest to assault with a deadly weapon and admitted three strikes in exchange for dismissal of the remaining enhancements. In July 2024, the court sentenced him to 25 years to life in prison.

Defendant timely appeals with a certificate of probable cause.

**DISCUSSION**

**I**

**Law On Diversion**

Section 1001.36 "authorizes pretrial mental health diversion for defendants with qualifying mental health disorders." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147.) The trial court must find a defendant is both eligible and suitable for diversion. (§ 1001.36, subds. (b)-(c).)

A defendant is *eligible* for diversion if the defendant has been diagnosed with a qualifying mental disorder and the defendant's mental disorder was "a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b).) A defendant is *suitable* for diversion if in the opinion of a qualified mental health expert, the defendant's mental disorder symptoms that caused, contributed, or motivated the defendant's criminal

5

behavior would respond to mental health treatment; the defendant consents to diversion and waives his or her speedy trial rights; the defendant agrees to comply with treatment as a condition of diversion; and the defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community. (§ 1001.36, subd. (c)(1)-(4).)

We review a trial court's order denying mental health diversion for abuse of discretion and its factual findings for substantial evidence. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448-449.)

## II

### The Trial Court Acted Within Its Discretion In Denying Diversion

Defendant contends the trial court abused its discretion in finding he was not suitable for diversion by finding he posed an unreasonable risk to public safety if treated in the community. We disagree because substantial evidence supports the trial court's public dangerousness finding.

An "unreasonable risk of danger to public safety" means an unreasonable risk that the petitioner will commit a new violent "super strike" that includes murder or attempted murder. (§§ 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv)(IV); *People v. Whitmill*, *supra*, 86 Cal.App.5th at p. 1150.) In determining the risk to public safety, a trial court will consider "the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Here, as the trial court recognized, the district attorney opposed diversion given the violent nature of the current offense and defendant's lengthy criminal history that included three violent felony convictions for robbery. The court was mindful that it had earlier released defendant on DSH diversion in the burglary case over the district attorney's dangerousness objection only to have defendant abscond two days later and

6

assault the victim at knifepoint. Thus, even though defendant had been medicated at that time and his mental health symptoms supposedly had been stabilized, he still chose to leave the treatment facility and violently accost the victim here, making it reasonable to infer he was more likely to commit a super strike offense if the court released him on diversion a second time.

The trial court also properly considered the violent nature of the current offense in making its dangerousness finding. As the court noted, defendant followed a stranger in the early morning hours as she opened a Starbucks and attacked the woman from behind, putting his arm around her while holding a knife in his hand, even if, as the court acknowledged, it was unclear whether he put the knife to her throat. The victim's resistance, which resulted in her finger being cut as she pushed defendant's arm away, could have "gone very bad for her," resulting in serious injury or death. Other courts have upheld a dangerousness finding based on similar circumstances. (See, e.g., *People v. Hall* (2016) 247 Cal.App.4th 1255, 1265-1266 [the defendant had a history of felony convictions spanning nearly two decades, including two prior strike convictions for robbery, and the defendant pressed a knife to the victim's stomach in committing the most recent offense].)

Defendant argues that Dr. Deubert opined in February 2024 (nearly two years after the assault with a deadly weapon charge) that he was responding well to treatment and "did not present a danger to self or others at the time of the evaluation." The trial court, however, discounted Dr. Deubert's opinion because she had evaluated defendant in the context of a confined jail setting when he had been medicated. And Dr. Deubert herself recognized several factors that would increase defendant's risk for future violent offending, including his mental illness symptoms, substance use, housing instability, history of violence and unemployment. Defendant's history of medication noncompliance and his use of substances (for which he had never obtained substance

7

abuse treatment), in Dr. Deubert's opinion, could also increase his risk of violently reoffending.

While Dr. Deubert opined defendant did not appear to be a risk to public safety when she evaluated him, that was not the only evidence the trial court considered. And even the existence of some evidence to support a contrary finding does not show the trial court abused its discretion in concluding defendant posed an unreasonable risk of committing a super strike. (*People v. Brown* (2024) 101 Cal.App.5th 113, 123-124.)

## DISPOSITION

The trial court's order denying mental health diversion and the judgment are affirmed.


___/s/_____
MESIWALA, J.

We concur:


___/s/_____
HULL, Acting P. J.


___/s/_____
RENNER, J.

8